IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

DOUGLAS A. TURNER, and wife,        )
DIANE TURNER,                        )
                                     )
        Plaintiffs,                  )
                                     )
v.                                   )        Civil Action No. 3:06cv0639
                                     )
LIBERTY NATIONAL LIFE               )        Judge Thomas A. Wiseman, Jr.
INSURANCE COMPANY,                   )
                                     )
        Defendant.                   )

## MEMORANDUM OPINION

Before the Court is Defendant Liberty National Life Insurance Company's Motion for Summary Judgment (Doc. No. 32). Plaintiffs Douglas A. Turner and Diane Turner (collectively, "Plaintiffs") filed their Response to Defendant's Motion (Doc. No. 38) and Memorandum in Opposition (Doc. No. 39) on July 10, 2007. Liberty National filed its Reply in Support of Motion for Summary Judgment (Doc. No. 50-1) on July 24, 2007. Liberty National's motion for summary judgment is fully briefed and ripe for consideration.[1]

For the reasons set forth below, the Court will grant Liberty National's Motion for Summary Judgment and dismiss any and all remaining claims including Mr. Turner's claims for violation of the Tennessee Jury Duty Statute and his wife's loss of consortium claims.[2]

## I.    Factual Background

The facts set forth herein are undisputed unless otherwise noted.

### A.    Mr. Turner's Employment with Liberty National

The Turners are husband and wife and are citizens of Rutherford County, Tennessee. Liberty National is a non-Tennessee corporation with its principal place of business in Birmingham, Alabama.

---

[1] On July 27, 2007, Liberty National filed a Motion for Rule 11 and 28 U.S.C. § 1927 Sanctions (Doc. No. 53-1) and Memorandum in Support (Doc. No. 54) asking the Court to impose sanctions against Plaintiffs and/or Plaintiffs' counsel for filing Plaintiffs' original Complaint and pursuing litigation relative to baseless claims. That motion has been addressed by the Court in a separate filing.

[2] In its Memorandum Opinion and Order dated May 16, 2006 (Doc. Nos. 22 & 23), the Court granted Liberty National's motion to dismiss Mr. Turner's common-law cause of action for retaliatory discharge, but denied the motion to dismiss Mr. Turner's claims for violation of the Tennessee Jury Duty Statute and his wife's loss of consortium claims.

Liberty National's primary business is selling life insurance policies. Mr. Turner began his employment with Liberty National in June 1974. Mr. Turner is currently employed with Liberty National as a sales agent in its Murfreesboro, Tennessee District Office. (Doc. No. 33, at 2.) Sales agents are compensated on a weekly basis. According to Liberty National, each agent's paycheck is made up of three primary components: (1) "Commissions" on new policies they have issued in the last year, (2) "Renewals" on policies which are renewed after their first year, and (3) "Service Fees" for policies they service on a regular basis. (Doc. No. 33, at 2–3.)

In addition to their regular salary, Liberty National agents are eligible to earn a monthly production bonus if they meet certain criteria. (Doc. No. 41, at ¶ 3.) As of February 1, 2006, whether a Liberty National sales agent qualified for a monthly bonus depended upon the agent's performance and premiums averaged over the previous thirteen weeks. (Doc. No. 41, at ¶ 4.) Unlike the agents' regular paychecks, which are typically direct-deposited on a weekly basis, the bonus checks are cut separately and issued through a "live" check at the end of the month. There is no question that most agents do not receive a bonus on a monthly basis. (Doc. No. 41, at ¶ 5.) In fact, only 10% of Liberty National's agents qualify for a bonus on a monthly basis and Mr. Turner admits that in the past he has typically received a bonus only three to four times a year. (Doc. No. 41, at ¶ 6.)

**B.      Mr. Turner's Jury Duty Service**

In early February 2006, Mr. Turner received a summons to appear for grand jury duty in Murfreesboro, Rutherford County, Tennessee. The next day, Mr. Turner showed the summons to his District Manager, Bill Hampton. Upon seeing the summons, Mr. Hampton allegedly told Mr. Turner, "You know how to get out of that." (Compl. ¶ 7.) Notwithstanding this comment, Mr. Turner did not "get out of" jury duty. There is no dispute that Liberty National allowed Mr. Turner time off to serve jury duty, and Mr. Turner actually did serve jury duty from Monday, February 6, 2006 through Wednesday, February 8, 2006. (Doc. No. 41, at ¶ 9.)

Prior to receiving the summons for jury duty, Mr. Turner had scheduled an appointment to meet with Janice Matheny, an existing client, on February 8 in order to complete an application for a $25,000 life insurance policy on Ms. Matheny's teenage son, James McCoy. However, based on the grand jury summons and his expectation, based upon speaking with Rutherford County Chancellor Robert Corlew,

that his services would be required from Monday, February 6 through Thursday, February 9, Mr. Turner cancelled all of his appointments for that week including the meeting scheduled with Ms. Matheny.

Also prior to receiving the jury summons, Mr. Turner and his wife had planned to take vacation time and go out of town on Friday, February 10, 2006. This vacation day had already been approved by Mr. Hampton. Although he expected to serve jury duty on February 9, 2006, Mr. Turner ended up not being called to duty that day. Once Mr. Turner discovered that he did not have jury duty on Thursday, February 9, he attempted to reschedule some work appointments for that day. He was able to process a death claim of an insured, to meet with another client about his wife's insurance, and to meet with two clients who were delinquent in their payments. Mr. Turner also stopped by the home of Ms. Matheny, but she was not there at the time. On Friday, February 10, Mr. Turner left on his scheduled vacation.

C.    The McCoy Policy

On Monday, February 13, Mr. Turner returned to work after his weekend vacation. He met with Ms. Matheny and sold her the life insurance policy for her son (the "McCoy policy"). On Wednesday, February 15, 2006, Mr. Turner submitted the documents for the McCoy policy to the appropriate employees at Liberty National. After submitting the documents, Mr. Turner learned of a new company policy that required additional documentation from Ms. Matheny in order to secure her son's insurance policy, specifically a bank draft form from the applicant. Accordingly, Mr. Turner obtained a bank draft form from Ms. Matheny and forwarded it to Liberty National on Thursday, February 16, 2006, thus completing the life insurance application for Mr. McCoy on February 16. (Doc. No. 41, at ¶ 11.) During that time period, applications were typically mailed from the District office to the corporate office twice a week – on Wednesdays and Fridays. (Doc. No. 33, at 5.) Because the McCoy policy application was turned in on a Thursday, it was mailed to the corporate office in Birmingham Alabama on Friday, February 17 and received by the corporate office on Tuesday, February 21. (Doc. No. 22, at 6.)

Once an application is received by the corporate office, it must be processed through Liberty's underwriting department prior to being "issued." (Doc. No. 33, at 6.) According to Liberty National, each application submitted can be subjected to a myriad of underwriting requirements including but not limited to calls to verify information on the application, blood work or other medical examinations, and issuance of Motor Vehicle Reports ("MVRs"). (Doc. No. 33, at 6.) Thus, the "issue date" for any given policy is the

date when all underwriting and other requirements are met; there is no individual person who makes a decision to issue a policy on a particular date. (Doc. No. 33, at 8.)

According to Liberty National, the underwriting requirements for the McCoy policy were not met until Monday, February 27, 2006, and the policy was not actually issued until March 1, 2006. (Doc. No. 33, at 8.) Mr. Turner was told that the reason the McCoy policy took six days to issue was the need to obtain an MVR for Mr. McCoy. According to Liberty National, an MVR is required in almost every case for 16- to 17-year-old males.[3] Once the request for an MVR is made to LabOne, an independent third-party contractor, it typically takes 72 hours, at a minimum, for LabOne to process the request and forward the MVR to Liberty. Liberty National did not receive the MVR for the McCoy application from LabOne until Monday, February 27, 2006. (Doc. No. 41, at ¶ 14.)

Liberty National considers the last Friday of each month to be the last day of the month for purposes of bonus calculations. Thus, in order to have been considered issued within the February bonus period, the McCoy policy would have to have been issued by February 24, 2006, which was the last Friday of the month of February that year. Mr. Turner does not dispute that fact. However, he claims that Liberty National received the completed MVR report by electronic image format on Friday, February 24, 2006. However, Mr. Turner does not dispute the fact that the MVR report was not available for immediate viewing because LabOne has a different electronic imaging system and images sent from LabOne must be synched with Liberty's system before they can be viewed, which typically takes two business days. (Doc. No. 33, at 7.) Thus, the image was not available for review on Friday, February 24, even if it was technically in Liberty National's system on that date.[4]

--------

[3]Mr. Turner attempts to dispute this fact by stating that he could not remember ever having an MVR required for an application submitted for a 16- or 17-year-old male. (See Doc. No. 41, at ¶ 12, Response (referencing Pl. Dep. at 67:13–15).) The fact that Mr. Turner could not remembering having an MVR required previously does not constitute evidence sufficient to create a material dispute regarding Liberty National's contention to the contrary.

[4]On February 27, 2006, Bill Hampton, Mr. Turner's local District Manager, emailed Terry Davis, Senior Vice President of Administration, asking him about the status of the McCoy policy. Davis responded, "Sorry, we did not get the MVR till today." (Doc. No. 33, at 8.) Liberty National acknowledges that the electronic image of the MVR was in fact received in its electronic system on February 24, 2006; however, no one in Liberty National's underwriting department was aware of its receipt until Monday, February 27, 2006.

On February 28, 2006, Mr. Turner wrote Terry Davis, Senior Vice President of Administration, directly asking him to make an exception and allow the McCoy policy to be treated as having been issued within the February bonus period.  (Doc. No. 33, at 9.)  Mr. Turner was notified that his request for an exception was denied by Jack Kelley, Liberty National's Executive Vice President, on March 1, 2006.[5] There is no credible or admissible evidence in the record that Mr. Davis had any involvement with the determination as to whether an exception could be made such that the McCoy policy could be considered to have been issued during the February bonus period or that either Mr. Davis or Mr. Kelley had any knowledge, at that time, that Mr. Turner had requested or taken any time off for jury duty.[6]  (Doc. No. 41, at ¶¶ 20-21; Doc. No. 33, at 9.)  In fact, Mr. Turner concedes that the only factor Mr. Kelley considered was whether the policy was actually  issued within the bonus computation period.  (Doc. No. 39, at 11.)

### D.     Qualifying for a Monthly Bonus at Liberty National

As of February 2006, Liberty National's sales employees became eligible for a monthly bonus based on criteria related to premiums averaged over the previous thirteen (13) weeks.  Thus, whether an agent such as Mr. Turner earned a bonus in February 2006 was based not only on the agent's production and number of policies issued in the month of February, but also the number of polices issued in January, 2006 and December, 2005.  For premiums to be calculated into the average for February, the agent had to ensure the policies for which he sought credit were issued[7] by month's end, which, as indicated above, Liberty National considers to be the last Friday of the month – in this case, Friday, February 24, 2006.

---

[5]In an email sent to all District Offices on November 2, 2005, Mr. Kelley informed them that there would be no further exceptions to the date of issuance of policies for purposes of bonus qualifications, but that Liberty National would be willing to consider adjustments for newly hired agents who had been with Liberty National three months or less.  (Doc. No. 41, at ¶ 23.)

[6]Mr. Turner purports to dispute the fact that Mr. Davis had no involvement in the decision-making process relative to the issue date of the policy or the bonus period for which it was considered based on inadmissible hearsay evidence that Mr. Davis was once asked to get a policy issued and he said he "would make a phone call."  (Doc. No. 41, ¶ 20.)  Mr. Turner also claims that Mr. Davis and Mr. Kelley were aware of his jury service based on the fact that Cindy Carroll had faxed documentation of his jury service to the "home office" on February 8, 2006.  (Doc. No. 41, ¶ 21.)  In other words, Mr. Turner speculates that Mr. Davis and or Mr. Kelley must have seen that documentation.  Although the Court is required to view the facts in the light most favorable to the non-movant, hearsay and speculation do not constitute admissible evidence and will not be considered.

[7]Pursuant to Liberty National's written rule, "Until a policy is issued and settled in the transaction register, neither the policy nor the premium will count for bonus purposes."  (See Pl.'s Dep. at 99:16–23 (Doc. No. 32-2, at 7).)

Because the underwriting requirements of the McCoy policy were not met until Monday, February 27, 2006 and the policy was not technically issued until March 1, 2006, it did not count towards the February 2006 bonus period.  (Doc. No. 41, at ¶ 17.)

Despite the fifty-eight (58) policies issued in January and the polices issued in December 2005 on behalf of Mr. Turner, each of which counted towards the February bonus period, Mr. Turner was unable to meet the premium average requirement to qualify for a monthly bonus for February 2006.[8]  According to Mr. Turner, if the McCoy policy had been included in that period, he would have received a bonus in the amount of $1,963.  Mr. Turner claims that if Liberty National had "subtracted the three days Mr. Turner actually served on the grand jury from the thirteen week period designated as qualifying for the bonus, he would have still qualified for the $1,963.00 bonus even though the Defendant waited until February 27, 2006 to issue the policy Mr. Turner had sold to Ms. Matheny for Mr. McCoy."  (Compl. ¶ 18.)[9]

Mr. Turner also concedes, however, that he had a charge-back on his account for the February 2006 period due to the fact that he had written different coverage on a policy previously credited to his account and that he knew from the beginning of February 2006 that the amount he needed to produce to qualify for a bonus that month would be a little more than it might otherwise have been.  (Doc. No. 32-2, at 9.)  Further, Mr. Turner also testified that he spent the two or three weeks before serving jury duty working the Buck Overby Construction Company account, but despite hours of work and his best efforts, he was only able to write a few insurance policies to Overby Construction employees.  (Doc. No, 39, at 14.)  It is undisputed that the McCoy policy was the only policy Mr. Turner sold in February 2006.  Mr. Turner admits that he has no way of knowing whether his vacation interfered with his ability to sell additional policies.  (Doc. No. 32-2, at 14.)

Mr. Turner only received bonuses in three of the fourteen months between July of 2005 and August of 2006, but maintains that he "should have" received bonuses in four or five of those months. (Doc. No. 32-2, at 10.)  Although the McCoy policy did not count toward the February bonus period, it was

---

[8]Mr. Turner admits that he received a production bonus of over $7,000 in January 2006 and approximately $1,600 in November 2005, but did not receive a bonus in December 2005 or any month between July and November 2005.  (Doc. No. 32-2, at 9.)

[9]As previously indicated, the policy was not issued until March 1, 2006.  Even if it had been issued February 27, 2006, however, it still fell outside the February bonus calculation period.

considered as part of the premium calculation for bonus purposes in March 2006 instead of February 2006. (Doc. No. 41, at ¶ 18.) Based at least in part on the issuance of the McCoy application during that period, Mr. Turner qualified for and actually received a bonus of approximately $1,900 in March 2006.[10]

## II. Procedural Background

Mr. Turner filed a grievance with Liberty National after his requests for an exception to the issue date of the McCoy policy were denied. On June 8, 2006, after his grievance was denied, he and Ms. Turner filed their claims in the Circuit Court for Rutherford County, Tennessee at Murfreesboro. On June 27, 2006, Liberty National filed a Notice of Removal based on 28 U.S.C. § 1446(d). This Court's jurisdiction is premised on complete diversity among the parties.

In the Complaint, Mr. Turner alleges that Liberty National failed to excuse him from employment on the days he served as a juror and that Liberty National discriminated against Mr. Turner in violation of the Tennessee Jury Duty Statute, Tenn. Code Ann. §§ 22-4-108(a)(1), (b)(1) & (f)(1) (the "Jury Duty Statute"), by failing to pay Mr. Turner the bonus that he would have received if the McCoy policy had been issued within the thirteen (13) week calculation period ending on February 24, 2006. Somewhat astonishingly, Mr. Turner demands judgment against Liberty National for $1,500,000 in compensatory damages and $15,000,000 in punitive damages. (Doc. No. 1-2, at ¶ 31.) Ms. Turner claims damages in the amount of $50,000 arising from her loss of consortium claim, and $500,000 in punitive damages.

On May 16, 2007, this Court issued an order declining to convert Liberty National's Motion to Dismiss to one for summary judgment and granting the motion to dismiss as to Mr. Turner's claim of retaliatory discharge, but denying the motion as it related to Mr. Turner's claim for violation of the Jury Duty Statute and his wife's loss of consortium claim. (Doc. No. 23.)

On June 20, 2007, Liberty National filed its Motion for Summary Judgment and supporting Memorandum, seeking judgment as a matter of law on the remaining claims based on the contention that Mr. Turner cannot show that he was denied his "usual compensation" while he served jury duty or that he was "discriminated" against in violation of the Jury Duty Statute when he did not receive a bonus in

---

[10]Mr. Turner testified that he did not receive a bonus for the months of April, May, June or July 2006. (Doc. No. 32-3, at 10.) The parties do not indicate whether Mr. Turner would have still received a bonus in March if the McCoy policy had been considered issued in February.

February 2006.  Mr. Turner maintains that material issues of disputed fact preclude summary judgment. The parties' arguments are considered below.

**III.    Standard of Review**

Summary judgment is appropriate where there is no genuine issue of material fact such that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  In determining a motion for summary judgment, the court must view the evidence in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  If the nonmoving party does not sufficiently demonstrate an essential element it had the burden of showing, the moving party is entitled to summary judgment as a matter of law.  See *Williams v. Ford Motor Co.*, 187 F.3d 533, 537-538 (6th Cir. 1999).

In determining whether a plaintiff has presented sufficient evidence to meet his burden and survive summary judgment, "the mere scintilla of evidence in support of the plaintiff's position [is] insufficient." *Mitchell v. Toledo Hospital*, 964 F.2d 577, 581 (6th Cir. 1992) (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)).  Rather, "there must be evidence on which the jury could reasonably find for the plaintiff." *Id.*  The defendant need not provide evidence disproving plaintiff's claims, rather, the defendant need only point out the absence of evidence to support plaintiff's case. *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996).  Thus, "[a] genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Hill v. White*, 190 F.3d 427, 430 (6th Cir. 1999) (citations omitted).

**IV.    Discussion**

This case presents a single legal issue to be decided by the Court:  whether Liberty National's treatment of Mr. Turner violated the Jury Duty Statute.  To resolve this issue the Court need only answer two questions:  (1) whether, as Mr. Turner argues, he was denied his "usual compensation" for the period of time he served as a juror in violation of Tenn. Code Ann. § 22-4-108(b)(1); and (2) whether, as Mr. Turner also contends, Liberty National discriminated (or retaliated) against Mr. Turner for serving jury duty by failing to pay him a bonus in February 2006 because he served three days of jury duty, in violation of Tenn. Code Ann. § 22-4-108(f)(1).  If, as Liberty National argues, a bonus is not part of the "usual compensation" for insurance agents and Mr. Turner cannot otherwise establish that he was discriminated

or retaliated against because of his jury duty, then Liberty National is entitled to judgment as a matter of law as to both Mr. Turner's claims and Ms. Turner's derivative loss of consortium claim.

**A.      Mr. Turner's Claims that Liberty National Violated the Tennessee Jury Duty Statute**

The Jury Duty Statute governs employees' rights and employers' responsibilities related to leave taken for jury duty.  The Jury Duty Statute requires that employers excuse an employee from employment "for the day or days required of the employee while serving as a juror," Tenn. Code Ann. § 22-4-108(a)(1),[11] and that each employee summoned for jury duty be paid his or her "usual compensation." Tenn. Code. Ann. § 22-4-108(b)(1).[12]   The statute also specifically prohibits any employer from discharging or otherwise discriminating against an employee for serving on jury duty.  Tenn. Code. Ann. § 22-4-108(f)(1).[13]  Mr. Turner alleges he was denied his "usual compensation" under the statute, and that he was otherwise "discriminated" against when he did not receive a bonus for February 2006.[14]

**1.   Whether Mr. Turner Was Denied His "Usual Compensation"**

Mr. Turner contends, first, that a bonus is part of an agent's usual compensation.  On the basis of that premise, Mr. Turner argues Liberty National violated Tenn. Code Ann. § 22-4-108(a)(1) when it

---

[11]Tenn. Code. Ann. § 22-4-108(a)(1) states as follows:

Upon receiving a summons to report for jury duty, any employee shall on the next day the employee is engaged in such employee's employment exhibit the summons to the employee's immediate superior, and the employee shall thereupon be excused from employment for the day or days required of the employee while serving as a juror in any court of the United States or the state of Tennessee. . . .

[12]Tenn. Code. Ann. § 22-4-108(b)(1) state as follows:

Notwithstanding the excused absence as herein provided, the employee shall be entitled to such employee's usual compensation received from such employment, less the amount of the fee or compensation the employee received for serving as a juror, except that the employer may pay the employee such employee's usual compensation without deducting an amount equal to the fee or compensation the employee received for such employee's jury service.

[13]Tenn. Code. Ann. § 22-4-108(f)(1) states in pertinent part:

No employer shall discharge or in any manner discriminate against an employee for serving on jury duty if such employee, prior to taking time off, gives the required notice pursuant to subsection (a) to the employer that such employee is required to serve.

[14]Although the Court dismissed Mr. Turner's common-law claim for retaliatory discharge, it appears from Mr. Turner's response that he is now arguing that he has a claim for retaliation under the Jury Duty Statute provision prohibiting an employer from discriminating "in any manner."  The Court considers Mr. Turner's retaliation claim to be part and parcel of his discrimination claims, as he essentially alleges the discrimination was in the form of retaliation.

insisted on including the three days Mr. Turner served on jury duty within the thirteen-week bonus calculation period, thereby "effectively fail[ing] to excuse Mr. Turner from employment for the days he served" (Compl. ¶ 25). He further argues that Liberty National violated § 22-4-108(b)(1) by refusing to issue the McCoy policy until the first work day after the conclusion of the thirteen-week bonus period, thus "effectively fail[ing] to pay Mr. Turner his usual compensation for the period he served as a juror." (Compl. ¶ 26.) Liberty National argues that it excused Mr. Turner from employment during the days he served jury duty; it paid him his usual compensation; and bonuses are not part of a sales agent's "usual compensation.

There is no dispute that Mr. Turner was actually excused from work and that he was paid his regular salary for the three days he served jury duty. The record clearly shows that Liberty National sales agents, such as Mr. Turner, are compensated on a weekly basis and Mr. Turner was paid $852.78 for the week in which he served on the jury and $3,187.60 for the entire month of February, without any deductions. There is also no question that he did not receive a bonus for the period ending February 24, 2006. The issue is whether a bonus should be considered part of his "usual compensation." Although the Jury Duty Statute states that an employee who serves on jury duty "shall be entitled to such employee's usual compensation received from such employment," Tenn. Code Ann. § 22-4-108, neither the statute nor Tennessee case law construing it defines the term "usual compensation." Moreover, the parties have not pointed to any case law in other states addressing the term "usual compensation" in the context of a jury duty statute. Accordingly, the Court will consider and construe the term so as to "ascertain and give effect to the legislative intent without duly restricting or expanding [the] statute's coverage beyond its intended scope." *Houghton v. Aramark Educ. Res., Inc.*, 90 S.W.3d 676, 678 (Tenn. 2002) (quoting *Owens v. State*, 908 S.W.2d 923, 926 (Tenn. 1995)).

Liberty National argues that a bonus is not, by its plain and ordinary meaning, part of the "usual compensation" for insurance agents at Liberty National or any other employees covered by the Jury Duty Statute. (Doc. No. 33, at 14.) Liberty National points out that the plain and ordinary meaning of "bonus" as "a sum of money or an equivalent given to an employee *in addition* to the employee's usual compensation" belies Mr. Turner's claim that the February 2006 bonus was his "usual compensation." *Miller v. Kroger Co.*, 82 Fed. Appx. 557, 560, 563 (9th Cir. 2003) (citations omitted).

The Court agrees. It is undisputed that Liberty National agents do not receive bonuses as a part of their regular paycheck or on a regular basis. Liberty National agents are eligible to earn a monthly production bonus if they meet certain criteria. (Doc. No. 41, at ¶ 3.) In fact, Mr. Turner admits that during the twenty-one month period prior to his deposition he only received a bonus three times and the record shows that only 10% of Liberty National's agents qualify for a bonus on a monthly basis. Further, unlike the agents' regular paychecks, which are typically direct-deposited on a weekly basis, the bonus checks are cut separately and issued through a "live" check at the end of the month. On the basis of these facts, the Court finds that the February 2006 bonus Mr. Turner claims he was denied was not part of his usual compensation. Cf. *Mosby v. State Farm Mut. Auto Ins. Co.*, 2005 WL 2600420 *17 (M.D. Tenn. Oct. 13, 2005) (recognizing the difference between lost pay as an adverse employment action, and loss of a bonus, which is not an adverse employment action in the context of a race-discrimination claim).

In an attempt to circumvent this common-sense conclusion, Mr. Turner asserts that the term "usual compensation" should somehow be analogized to an employee's average weekly wages relative to receipt of benefits under Tennessee's workers' compensation statute. (Doc. No. 39, at 4-5.) According to Mr. Turner, Liberty National should have treated his jury duty service like it would have been treated in computing his average weekly wages if he were asserting a workers' compensation claim by "subtract[ing] the three days Mr. Turner actually served on the grand jury from the 13-week period designated as qualifying for the bonus." (Compl. ¶ 18.)

In response, Liberty National first points out that the Jury Duty Statute only requires that it operate in its usual manner and provide him with usual compensation, not go out of its way to make special exceptions for an employee to receive a bonus he must earn separately from his regular paycheck. (Doc. No. 33, at 16.) Further, Liberty National points out that nowhere in the workers' compensation scheme, which provides "benefits" for employees rather than wages, is the term "usual compensation" found. (Doc. No. 50-1, at 2-3.) The fact that workers' compensation laws consider "tips and bonuses" as "anything of value received as consideration for the work," to be separate from and in addition to "wages and salary," while the Jury Duty Statute refers only to an employee's "usual compensation," shows that the statutes are intended to serve different purposes and address very different situations. Again, the Court agrees with Liberty National. Thus, even if Mr. Turner could prove that he was "denied" a bonus,

he cannot show he was denied his "usual compensation."[15]  The claim that Liberty National violated the Jury Duty Statute by denying Mr. Turner his "usual compensation" therefore fails.

**2.  Whether Mr. Turner Was Discriminated or Retaliated Against In Any Manner As a Result of His Jury Service.**

Mr. Turner alleges he suffered discrimination for serving on jury duty in violation of Section 22-4-108(f)(1) of the Jury Duty Statute.  First, Mr. Turner claims that Liberty National's failure to give him "credit" for the three days he spent on jury duty caused him to suffer discrimination because he had three fewer days to earn a bonus in February than all of Liberty National's other insurance agents.  (Doc. No. 39, at 14.)  Second, Mr. Turner claims that Liberty National has permitted other employees to receive a bonus under similar circumstances.  (Compl. ¶ 27.)  Finally, Mr. Turner implicitly argues that he was denied an exception to the issuance date for the McCoy policy in retaliation for his having served jury duty.  As set forth above, however, both Mr. Kelley and Mr. Davis testified that they did not have any information that Mr. Turner had served on a jury at the time they made their decisions related to the February 2006 bonus.  Mr. Turner has not submitted any admissible evidence to contradict their testimony or pointed to any evidence creating a material issue of disputed fact that would preclude summary judgment in Liberty National's favor.  The bottom line is that Mr. Turner has not pointed to or presented any admissible evidence on the basis of which a reasonable jury might conclude that Liberty National took any action *because* of Mr. Turner's jury duty.  Liberty National is entitled to summary judgment in its favor on Mr. Turner's claim of discrimination in violation of the Jury Duty Statute.

**B.    *Mrs. Turner's Loss of Consortium Claim***

Plaintiff Diane Turner claims that she lost "much of the companionship and consortium she would otherwise have received from her husband in the course of their marital relationship" as a proximate result of Liberty National's violation of the Jury Duty Statute.  (Compl. ¶ 31.)  Tennessee law provides for a right of recovery for loss of consortium for a person whose spouse is injured.  Tenn. Code Ann. § 25-1-106.  However, a claim for loss of consortium arises from the same operative facts as the primary claim

---

[15]Even if, *arguendo*, the February 2006 bonus were considered "usual compensation" in the present case, there is no question that Liberty National did not *deny* Mr. Turner a bonus in February 2006.  Rather, as Mr. Turner apparently concedes, Mr. Turner failed to *earn* the bonus in February because he failed to submit or issue even one policy during the February bonus time period.  Moreover, there is absolutely no evidence to show that it was his jury duty service alone which caused him to miss his bonus in February.

and cannot survive if the impaired spouse's claim fails. Because the Court has concluded that Liberty National is entitled to judgment as a matter of law as to Mr. Turner's claims, Ms. Turner's loss of consortium claim cannot survive and will also be dismissed.

**V.      Conclusion**

For the reasons set forth above, Liberty National's Motion for Summary Judgment will be granted and this matter dismissed. An appropriate order will enter.

Thomas A. Wiseman, Jr.
Senior U.S. District Judge